**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT CANFIELD, individually and for his individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | 18 Civ. 8913 |
| BONNIE KARTZ, individually and for her individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | **COMPLAINT** |
| LATRECIA ONUNKWOR, individually and for her individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | |
| DIANA WEAVER, individually and for her individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | |
| DAVID OSTERMEYER, individually and for his individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | |
| Plaintiffs, | |
| v. | |
| SS&C TECHNOLOGIES HOLDINGS, INC., DST SYSTEMS, INC., THE ADVISORY COMMITTEE OF THE DST SYSTEMS, INC., 401(K) PROFIT SHARING PLAN, THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF DST SYSTEMS, INC., RUANE, CUNNIFF & GOLDFARB, INC., and John Does 1-20, | |
| Defendants. | |

Plaintiffs Robert Canfield, Bonnie Kartz, Latrecia Onunkwor, Diana Weaver, and David

Ostermayer, based on personal knowledge with respect to their own circumstances and based upon

information and belief pursuant to the investigation of their counsel as to all other allegations, allege as follows for their complaint against defendants SS&C Technologies Holdings, Inc., DST Systems, Inc., The Advisory Committee of the DST Systems, Inc., 401(k) Profit Sharing Plan, The Compensation Committee of the Board of Directors of DST Systems, Inc., Ruane, Cunniff & Goldfarb, Inc., and John Does 1-20:

## NATURE OF THE ACTION

1.      Plaintiffs Robert Canfield ("Plaintiff Canfield"), Bonnie Kartz ("Plaintiff Kartz"), Latrecia Onunkwor ("Plaintiff Onunkwor"), Diana Weaver ("Plaintiff Weaver"), David Ostermeyer ("Plaintiff Ostermeyer") (collectively, "Plaintiffs"), individually and on behalf of the DST Systems, Inc., 401(k) Profit Sharing Plan (the "DST Retirement Plan" or "Plan"), bring this action pursuant to §§ 409, 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3), against SS&C Technologies Holdings, Inc., into which DST Systems, Inc. ( "DST") was merged, and the individual members of The Advisory Committee of the DST Systems, Inc., 401(k) Profit Sharing Plan at the time of the acts, errors and omissions alleged herein, the individual members of The Compensation Committee of the Board of Directors of DST Systems, Inc. at the time of the acts, errors and omissions alleged herein, Ruane, Cunniff & Goldfarb, Inc., (the "Investment Manager" or "Ruane") and John Does 1-20 (collectively with DST and Ruane, "Defendants"), each acting in the capacity of a fiduciary of the DST Retirement Plan, as defined under 29 U.S.C. § 1002(21)(A), for breaching the responsibilities, obligations, and/or duties imposed upon such ERISA plan fiduciaries.

2.      DST provides global information processing services and support to clients in the asset management, insurance, retirement, brokerage and healthcare industries.  The Sequoia Fund,

2

Inc., was among DST's clients at the times herein pertinent. During the relevant period, DST served as registrar and shareholder servicing agent for the Sequoia Fund, Inc.

3.     The DST Retirement Plan is an individual account or defined contribution pension plan under 29 U.S.C. §§ 1002(2)(A) and 1002(34) and is subject to the provisions of ERISA. The Plan was established and is maintained under a written document in accordance with 29 U.S.C § 1102 and is intended to provide retirement savings and retirement income to employees and former employees of DST, and DST's subsidiaries and affiliate employers.

4.     On information and belief, the trustee of the Plan is BMO Harris Bank N.A. (the "Trustee"), which holds and administers all assets of the DST Retirement Plan.

5.     On information and belief, a portion of the Plan's assets are invested in the DST Systems, Inc. Master Trust ("Master Trust").  The investment manager of the Master Trust was and/or is Defendant Ruane, Cunniff & Goldfarb & Co., Inc.  Ruane is, and/or at pertinent times was, also the distributor and advisor to the Sequoia Fund, Inc., which, in turn, was a client of DST as aforesaid.

6.     Plaintiffs allege that Defendants breached their fiduciary duties by, *inter alia*, (1) failing to use the "care, skill, prudence, and diligence … that a prudent person acting in a like capacity and familiar with such matters would use"; (2) failing to divest and/or diversify the investments of the DST Retirement Plan so as to minimize and/or reduce the risk of large losses, when under the circumstances it was prudent to do so; (3) failing to confirm that the Plan's underlying investments were consistent with the stated description of the Plan; (4) failing to prudently select and monitor the Investment Manager and the Plan's investments; (5) failing to investigate the merits of the Plan's investments; (6) failing to select and/or retain an investment manager with whom they had no selfish interest apart from the interests of the Plan participants;

3

(7) failing to discharge their duty to select and retain an investment manager solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to Plan participants and beneficiaries; (8) failing to disclose complete and accurate and material information regarding the assets in the DST Retirement Plan; (9) failing to determine the reasonableness of the compensation paid to Ruane; (10) failing to investigate all decisions affecting the Plan; (11) failing to represent, disclose or participate in actions on behalf of the Plan or its individual participants related to claims against Valeant Pharmaceuticals; (12) failing to take appropriate steps to advise, and/or cause to be advised, the Plan participants that the Plan was and/or had been in the past invested in an undue concentration; (13) failing to take appropriate steps to advise, and/or cause to be advised, the Plan participants that the Plan had suffered significant losses as a result of improper and ill-advised investment; (14) failing to take steps to timely recover Plan losses resulting from the imprudent investment; (15) failing to adjust the values of Plan distributions for roll-over purposes so as to make whole those individual Plan accounts which had suffered losses due to the imprudent investment; and/or (16) failing to take all actions prudent and/or necessary to protect, secure and make whole the interests of those who suffered losses in their individual Plan accounts, which losses occurred as a result of an imprudent investment, as hereinafter described.

7.      Plaintiffs bring this action to recover the losses caused to their accounts, on behalf of the DST Retirement Plan, and for the following relief:

   ▪ A declaratory judgment declaring that the acts of Defendants described herein violate ERISA and applicable law;

   ▪ Disgorgement and/or restitution of all fees, payments, compensation and other monies improperly received and/or withheld by Defendants, or any of them, including, without limitation, all profits realized by Defendants, or any of them, in connection with their receipt of such payments and/or unlawful compensation;

- Unpaid benefits, including without limitation, all amounts necessary to make whole each Plaintiffs' individual account as regards the value of his/her individual Retirement Plan account which was diminished as of Plaintiffs roll-over, transfer, or termination of participation in the DST Retirement Plan, which diminution in value occurred, in whole or in part, and/or was caused or contributed to by, or as a result of, the imprudent investment as hereinafter described;

- Pre-judgment interest in the amount authorized by law;

- Losses to Plaintiffs' accounts as a result of any violation of ERISA;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

## THE PARTIES

8.     Plaintiff Canfield is currently a resident of Kansas. Plaintiff Canfield was employed by DST as general counsel, and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

9.     Plaintiff Kartz is currently a resident of California. Plaintiff Kartz is a former employee of DST, and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

10.     Plaintiff Onunkwor is currently a resident of Missouri. Plaintiff Onunkwor was employed by DST and is now an employee of SS&C, and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

11.     Plaintiff Weaver is currently a resident of Missouri. Plaintiff Weaver was employed by DST, and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

12.     Plaintiff Ostermeyer is currently a resident of Arizona. Plaintiff Ostermeyer was employed by DST and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

13.     Defendant SS&C Technologies Holding, Inc. ("SS&C") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Windsor, Connecticut. On or about April 16, 2018, SS&C acquired DST, including assumption of debt. DST was, at all pertinent times, the sponsor of the DST Retirement Plan and the administrator of the DST Retirement Plan. DST was a designated fiduciary of the DST Retirement Plan and a fiduciary under 29 U.S.C. §§ 1002, 1102.

14.     Defendant DST was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas City, Missouri. DST was the sponsor of the DST Retirement Plan and the administrator of the DST Retirement Plan. DST was a designated fiduciary of the DST Retirement Plan and a fiduciary under 29 U.S.C. §§ 1002, 1102.

15.     Defendants the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee") is named in the DST Retirement Plan as the "named fiduciary," a term that is defined in 29 U.S.C. §§ 1102, and is otherwise a fiduciary under 29 U.S.C. §§ 1002. The Advisory Committee maintains its address at the headquarters of DST Systems in Kansas City, Missouri.

16.     Defendants the individual members of the Compensation Committee of the Board of Directors of DST (the "Compensation Committee"), on information and belief, have the sole authority to select and remove members of the Advisory Committee. As such, the Compensation Committee, and each of its members, is a Plan fiduciary under 29 U.S.C. § 1002 since the committee, and its members, among other things, appoint other Plan fiduciaries. The

Compensation Committee maintains its address at the headquarters of DST Systems in Kansas City, Missouri.

17.     Defendant, Ruane is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. Ruane is an investment firm which at pertinent times herein served as an investment adviser and fiduciary to the Plan pursuant to 29 U.S.C. § 1002.

18.     Plaintiffs are currently unaware of the members of the Compensation Committee and Advisory Committee, each of whom is a Plan fiduciary under 29 U.S.C. §§ 1002, 1102. Claimant refers to them, collectively, as John Does 1-20.

19.     The DST Retirement Plan is an individual account or defined contribution pension plan under 29 U.S.C. §§ 1002(2)(A) and 1002(34) and is subject to the provisions of ERISA. The Plan was established and is maintained pursuant to a written document in accordance with 29 U.S.C § 1102 and is intended to provide retirement savings and retirement income to employees and former employees of DST, and employees and former employees of certain of DST's subsidiaries and affiliates.

**JURISDICTION AND VENUE**

20.     This Court has federal question subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this is an action under 29 U.S.C. § 1132(a)(2). This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) since the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

21.     Venue is proper in this District because Ruane managed the Plan investments in this district, the breaches complained of took place in whole or in part in this District, Ruane, which

has its headquarters in New York, New York, maintains its principle place of business in this District, and the wrongful acts, errors and omissions committed by the Defendants as complained of herein occurred in substantial part in this District. 29 U.S.C. § 1132(e)(2). All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

22.     Under the terms of the DST Retirement Plan, the Plan consist of two components: *first*, a 401(k) portion, which includes participant payroll and DST's matching contributions, and *second*, a "profit sharing" portion, which includes only contributions made by DST or certain of its affiliate employers who have adopted the DST Retirement Plan for the benefit of their employees.

23.     As for the assets in the 401(k) portion of their individual accounts (hereinafter "the 401(k) portion" of the Plan), participants may exercise some control by choosing from a variety of mutual fund investment options made available by the Advisory Committee or, until recently (December 31, 2014), DST stock. However, although Plan participants could control, to some degree, the assets in the 401(k) portion of their individual accounts, they could not meaningfully minimize, through diversification, the overall risk of their portfolio nor could they construct a portfolio generative of a continuous and normally appropriate range of risks and returns.

24.     This is because, as for the assets in the profit-sharing portion of their individual accounts (hereinafter the "profit-sharing portion" of the Plan), participants could *not* exercise any control. Instead, the Trustee, as advised by the Investment Manager, which, in turn, was advised by Defendants, controlled the assets in the profit-sharing portion of the Plan.

25.     In fact, the Summary Plan Description (the "SPD") advised participants in the DST Retirement Plan that assets in the profit-sharing portion of the Plan which, on information and

8

belief, consists of more than half of the Plan's assets, "will be invested by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc.," and that "[participants] may not direct the investment of these funds into other investment alternatives." In its Form 11-K, for the fiscal year ending December 31, 2013, the Plan stated that "[t]he investment in Master Trust is non-participant directed and is managed by the Investment Manager."

26.     Thus, as for the assets in the profit-sharing portion of the Plan, participants relied entirely upon Plan fiduciaries including Defendants to invest the assets with the care, skill, prudence, and diligence of a prudent investor, to ensure that those assets were adequately diversified to minimize the risk of large losses, and to fully and accurately disclose the nature of the investments in the profit-sharing portion of the Plan.

27.     DST recently disclosed, however, that in contravention of the fiduciary obligations owed by those with discretion and control over the profit-sharing portion of the Plan, including each of the Defendants, the profit-sharing portion of the Plan was *not* properly diversified, even though it remained prudent to diversify the profit-sharing assets. In fact, rather than minimize the risk of large losses to the Plan, the Plan's fiduciaries caused and/or allowed Plan assets to be invested imprudently in the stock of Valeant Pharmaceuticals International, Inc. ("Valeant"), such that, as the value of Valeant stock dropped from a high of approximately $258 per share on or about July 31, 2015, to $15.41 per share on or about January 10, 2016, the Plan, and all participants, suffered enormous losses. The failure to diversify was the result of a defective and inappropriate process abusive of the lawful discretion afforded Defendants.

28.     On information and belief, at the end of 2014, approximately 30% of the profit-sharing portion of the DST Retirement Plan consisted of Valeant stock. This amounted to

approximately 15% of the Plan's combined assets and constituted a clear breach of Defendants' duty to diversify Plan assets in an appropriate and prudent manner.

29.     On information and belief, as a result of Defendants' breaches, as aforesaid, the value of the Plan's position in Valeant fell from a high of approximately $415 million to approximately $22 million, a loss of nearly $395 million.

30.     Securities and Exchange Commission ("SEC") guidelines illustrate the extremity and imprudence of the Plan's concentration in Valeant. Under SEC guidelines, which Defendants knew or should have known, a mutual fund cannot invest more than 25 percent (25%) of its assets in a single industry without disclosing the strategy to investors in the fund's prospectus. *See* Investment Company Act Release No. 13436 (Aug. 12, 1983) ("1983 Form N-lA Adopting Release"). *See also* Investment Company Act Release No. 23064 (Mar. 13, 1998) (Mar. 23, 1998) ("Form N-lA Adopting Release"). The SEC recognizes the immense and inherent risk in concentrating Plan assets in a single industry, including even those that contain hundreds of companies with a collective market capitalization in the trillions of dollars.  In this case, the ordinary risk aversion principles set forth by the SEC are compounded by virtue of the fact that the assets at issue are retirement assets and therefore must be invested in accord with conservative, risk-averse investment objectives.  Defendants invested 30 percent (30%) of the assets in the profit-sharing portion of the Plan *in a single stock.* No prudent fiduciary under like circumstances would have or could have made the same decision to invest so heavily in a single stock.

31.     In fact, an SPD, dated January 1, 2000, advises Plan participants that "It is generally unwise to overly concentrate your Account in an investment option which holds a single security or in any single investment option." Yet, that is precisely what Defendants did with the assets in

the profit-sharing portion of the Plan as regards the aforesaid investments in Valeant Pharmaceuticals, Inc.

32.     Additionally, in the Plan's account statements, DST and/or Ruane make the following statement, and admission regarding the risk of undue concentrations and diversification, to wit:

> "To help achieve long-term retirement security, you should give careful consideration to the benefits of a well-balanced and diversified investment portfolio. Spreading your assets among different types of investments can help you achieve a favorable rate of return, while minimizing your overall risk of losing money. This is because market or other economic conditions that cause one category of assets, or one particular security, to perform very well often causes another asset category, or another particular security, to perform poorly. *If you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified.*"

(Emphasis added.)

33.     Moreover, contrary to the assertion in the SPD that "[t]he Plan … reflect[s] your Employer's concern for your long-term *savings* need," Valeant, as shown below, pursued a particularly risky and aggressive growth strategy. Thus, even if prudence allowed for concentration in a single stock, which it does not, no prudent fiduciary under like circumstances would have or could have made the decision to invest so heavily in Valeant.  The Defendants, and each of them, knew or should have known that Valeant was unsuitable for an investment in a retirement account. Defendants failed to invest only in those securities which were suitable to the investment objectives of the Plan.

34.     Valeant is a Canadian healthcare company that develops, manufactures, and markets branded generic pharmaceuticals, over-the-counter products, and other medical products. On information and belief, Valeant has pursued an aggressive growth-by-acquisition model since at least 2008. In 2008, for example, Valeant bought Coria Laboratories for $95 million and

DermaTech (an Australian company) for $12.6 million.[1] The following year, in 2009, Valeant bought Dow Pharmaceutical Sciences Inc., for $285 million and in 2010, Valeant bought Aton Pharmaceuticals for $318 million.[2] In 2011, Valeant bought PharmaSwiss for $481 million and AB Sanitas of Lithuania for about $500 million.[3] Then, in 2012, Valeant bought Medicis Pharmaceutical Corp. for $2.6 billion and in 2013, Valeant bought Bausch & Lomb for $8.6 billion. Finally, in 2015, Valeant bought Salix Pharmaceuticals for $11 billion.[4]

35.     Indeed, Valeant publicly disclosed that a "critical element" of its strategy was "business development" through acquisitions.[5]

36.     Valeant also engaged in creative accounting, using "cash earnings per share" as its earnings measure. This method shows far greater income than under standard generally accepted accounting principles ("GAAP") that investors typically use to compare companies. Under GAAP, the company posted $70 million in net income for the first nine months of 2015. Under its own cash earnings measure, however, the company posted a "profit" of $2.7 billion.[6]

37.     Thus, Valeant pursued a particularly risky and potentially dubious growth strategy, which clearly did not meet the Plan's purported investing criteria or the criteria of an objectively prudent fiduciary.

38.     Prudent fiduciaries, moreover, would have known that Valeant was a volatile and risky stock. Valeant made public its aggressive strategy and was the subject of intense industry scrutiny and speculation about whether its aggressive growth strategy, accounting, and business

---

[1] *Timeline - Shakeup at Valeant as Longtime CEO Pearson Leaving*, Reuters (March 21, 2016), http://www.reuters.com/article/valeant-timeline-idUSL2N16T1SQ.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *See* Valeant Pharm. Int'l, Inc., *2014 Annual Report* at i (2015), http://ir.valeant.com/~/media/Files/V/Valeant-IR/reports-and-presentations/893698-final-ar-2015-v001-x21nf3.pdf.
[6] *See, e.g.*, M. Rapoport & L. Hoffman, *Valeant: An Accounting Pioneer, Too*, Wall Street J., (Dec. 15, 2015), http://www.wsj.com/articles/valeant-an-accounting-pioneer-too-1450202504.

were legitimate. Investors and analysts publicly expressed significant concerns. The following is an example:

    a. In March 2014, Jim Grant, a financial journalist, asserted that Valeant was a "financialized pharmaceutical company," a claim that rung true since Valeant invested just 2.7 percent of sales into research and development, compared to an average of 13.8 percent among its competitors;[7]

    b. In May 2014, Bronte Capital's John Hempton announced that his fund was shorting Valeant, calling its accounting "difficult to comprehend."[8]

    c. In May 2014, hedge fund billionaire Jim Chanos observed that Valeant was playing "aggressive accounting games." He also criticized Valeant's acquisition strategy, noting the dangers and potential accounting issues associated with relying on purchasing other companies for long-term growth.[9]

    d. In June 2014, an email from a Morgan Stanley investment banker was released calling Valeant a "house of cards."[10]

    e. On October 21, 2015, Citron Research released a report titled: "Valeant: Could this be the Pharmaceutical Enron?" Citron questioned Valeant's relationship with the pharmacy Philidor and asked whether Valeant was "Enron part Deux??"[11]

---

[7] *See Contrarian Legend Jim Grant Presents His Killer Case Against Valeant Pharmaceuticals*, Bus. In Can. (Mar. 6, 2014), https://businessincanada.com /2014/03/06/jim-grant-bearish-case-on-valeant-pharmaceuticals/.
[8] *See Timeline, supra* note 2.
[9] *See* Linette Lopez, *Wall Street is starting to believe what Jim Chanos has been saying about Valean all along*, Bus. Insider (Nov. 4, 2015), http://www.business insider.com/is-valeant-an-accounting-roll-up-2015-11.
[10] *See* Soyoung Kim & Olivia Oran, *Morgan Stanley calls Valeant 'house of cards' in Allergan pitch*, Reuters (June 16, 2014), http://www.reuters.com/article/us-allergan-morganstanley-idUSKBN0ER1L120140616.
[11] *See* Citron Research, *Valeant and Philidor RX The Big Coverup* (2015), http://www.citronresearch.com/wp-content/uploads/2015/10/Valeant-Philador-and-RandO-final-a.pdf.

f.   On or about October 31, 2015, Charlie Munger, Berkshire Hathaway's vice chairman and a close business partner of Warren Buffett, publicly called Valeant's practices "deeply immoral" and its business strategy unsustainable.[12]

39.   There was even public discord among the directors of the Sequoia Fund Inc., for which Defendant Ruane was the distributor and advisor, about Valeant. On October 25, 2015, two of the four independent directors resigned in protest after Defendant Ruane announced that the fund had purchased an additional 1.5 million shares of Valeant.[13] Thus, Defendants knew or should have known by at least 2011 that Valeant was a particularly risky and imprudent investment.

40.   A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have, prior to or upon the Plan's concentration in a single stock, ordered that the profit-sharing portion of the Plan be diversified so as to minimize the risk of large losses. A prudent fiduciary would have been particularly vigilant in reviewing and investigating the decision to invest in, and to continue investing in, Valeant given the widespread and extensive public concern with the company. Indeed, a plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have known of Valeant's volatile and risky growth strategy by at least early 2014 and would have by then ordered that the Plan divest itself of the risky stock.

41.   Defendants, however, did not act with the care, skill, prudence, and diligence of a prudent person. Despite public concern with Valeant and the obvious lack of diversification in the profit-sharing portion of the Plan and its attendant risk of large losses to the Plan, Defendants (1) failed to diversify the profit-sharing portion of the Plan so as to minimize the risk of large losses, when under the circumstances it was clearly prudent to do so; (2) failed to confirm that the Plan's

---

[12] James B. Stewart, *Huge Valeant Stake Exposes Rift at Sequoia Fund*, N.Y. Times, Nov. 12, 2015, http://www.nytimes.com/2015/11/13/business/huge-valeant-stake-exposes-rift-at-sequoia-fund.html?_r=0.
[13] *Id.*

underlying investments were consistent with the stated description, intent, purpose, character, needs and investment objectives of the Plan and Plan Participants; (3) failed to prudently select and monitor Ruane and the Plan's highly-concentrated investments; and (4) failed to investigate the prudence of the Plan's Valeant investment.

42.     In addition, while a plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have elected not to retain and/or continue to retain Defendant Ruane as an investment manager, in light of its demonstrable imprudence in failing to adequately diversify the profit-sharing portion of the Plan and in buying the stock of a volatile, risky and unsustainable business, Defendants, acting with objective imprudence, continued to retain Defendant Ruane even as the Valeant stock plummeted and the Plan experienced enormous losses. In fact, not only did the DST Defendants retain Ruane, they continued to follow the advice of Ruane, knowing that such advice was flawed and unsuitable

43.     Moreover, Defendant Ruane is the distributor and advisor to the Sequoia Fund, Inc., which, in turn, is a client of DST (DST serves as the registrar and shareholder servicing agent for the Sequoia Fund, Inc.). Thus, DST receives, and has received, compensation from a fund for which Ruane is the advisor. A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have avoided this obvious conflict of interest.

44.     Instead, the Defendants perpetuated a triangular conflict in which each scratched the back of the other.  Further, on information and belief, DST, as servicing agent for the Sequoia Fund, Inc., was aware of the investment decisions, positions, and results of the Sequoia Fund and, although it knew or should have known that the investment objectives and suitability standards applicable to the Sequoia Fund were, and should have been, distinguishable from those owing to an ERISA retirement fund, sought, requested, ordered, and implemented a quasi-fund to match the

investment strategies and decisions of the Sequoia, ignoring that ERISA retirement plans do not share the same risk tolerance, investment objectives, and customer traits as a public fund. Having failed to make this distinction, Defendants did not act with the care, skill, prudence, and diligence of a prudent person

45.     Defendants selected and retained an investment manager, with whom they had a selfish interest, apart from the interests of the Plan participants. By retaining Defendant Ruane, Defendants failed to discharge their duty to select and retain an investment manager solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to Plan participants and beneficiaries.

46.     In fact, with the authority, approval and consent of the Defendants, which authority, approval and consent Defendants provided while acting as Plan fiduciaries, Ruane charged the DST Retirement Plan an annual fee of one percent (1%) of the assets in the Master Trust. The fee is grossly and objectively excessive and exceeds that which, if acting without self-interest, with the requisite prudence and oversight, and in the sole interest of the Plan and its participant, Defendants could have negotiated. A prudent fiduciary under like circumstances would have negotiated an annual fee of far less than one percent (1%). Thus, by failing to determine and/or investigate the reasonableness of the compensation paid to Ruane, Defendants breached the fiduciary duties owed to the Plan.

47.     Finally, while acting as Plan fiduciaries, Defendants failed to provide participants with sufficient information regarding the nature of the profit-sharing portion of the Plan such that participants could make informed decision with regard to the management of the 401(k) portion of their individual accounts. A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have informed Plan participants of the concentration of the profit-

sharing portion of the Plan in Valeant stock and of the volatile, risky and unsustainable business of Valeant. Defendants, however, did not act with the care, skill, prudence, and diligence of a prudent person. Defendants failed to disclose complete, accurate and material information regarding the nature of the assets in the DST Retirement Plan.

48.     As shown herein, Defendants clearly failed to investigate all decisions affecting the Plan. As a result, Defendants breached the fiduciary duties owed to the Plan.

## ERISA'S FIDUCIARY STANDARDS

49.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of
>
>> (i)  providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; [and]
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

50.     The most fundamental duty of ERISA plan fiduciaries is a duty of complete loyalty, under 29 U.S.C. § 1104(a)(1), which requires that plan fiduciaries discharge their duties "solely in the interest of the participants and the beneficiaries," i.e., "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Among the responsibilities and duties imposed

on fiduciaries by ERISA is avoidance of conflicts of interest. *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 251–52 (1993).

51. Second, the fiduciary must meet a "prudent man" standard under 29 U.S.C. § 1104(a)(1)(B), to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use" and "with single-minded devotion" to the plan participants and beneficiaries.

52. According to the Department of Labor, 29 C.F.R. § 2550.404a–1(b), these requirements are satisfied if the fiduciary

(i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and

(ii) Has acted accordingly.

"Appropriate consideration" for purposes of this regulation includes, but is not limited to,

(i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and

(ii) Consideration of the following factors as they relate to such *portion* of the portfolio:

(A) The composition of the portfolio with regard to diversification;

(B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(C) The projected return of the portfolio relative to the funding objectives of the plan.

*Id.* at § 2550.404a–1(b)(2).

53.     Third, the ERISA fiduciary must diversify the plan's investments to minimize risk of loss unless, under the circumstances, it is clearly prudent not to diversify. 29 U.S.C. § 1104(a)(1)(C).

54.     ERISA and its associated regulations also impose upon fiduciaries extensive and specific obligations of disclosure. *See generally* 29 U.S.C. §§ 1021 *et seq*.

55.     For example, ERISA requires that a fiduciary disclose latent conflicts of interest which may affect a participants' ability to make informed decisions about their benefits.

56.     Moreover, when an ERISA plan, like the DST Retirement Plan, offers participants the opportunity to invest their own retirement funds, fiduciaries have an ongoing duty to monitor the plan's investment options and performance to ensure that they are prudent. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015). Accordingly, "a Claimant may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 1829.

57.     ERISA's fiduciary duties have been described as "the highest known to the law."

58.     A fiduciary is defined as any person "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A)(i).

59.     For example, a person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his or her position has discretionary authority or control over the management

or administration of the plan and is a fiduciary to the extent that he or she or it exercises, or refuses to exercise, that power.

60.     In addition to those fiduciaries described in Section 3(21)(A)(i), 29 U.S.C.§ 1002(21)(A)(i), ERISA also requires that every plan shall provide for one or more "named fiduciaries" who "jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102.

61.     In this case, each Defendant was a fiduciary of the Plan under 29 U.S.C. § 1102 and/or § 1002(21)(A)(i). Each Defendant managed, advised, and/or administered the Plan, and/or appointed and/or monitored a Plan fiduciary.

62.     Thus, Defendants, and each of them, owed each of the duties described above.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against All Defendants)

63.     The allegations of paragraphs 1 through 62 are incorporated herein by reference.

64.     Defendants are fiduciaries of the Plan under ERISA, as explained above, and are fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its assets.

65.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B) and (C) in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the

Plan, with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims.

66.    As set forth above, Defendants breached (1) the duty of complete loyalty; (2) the duty to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use;" (3) the duty to diversify the plan's investments to minimize risk of loss; (4) the duty to appoint, monitor and remove appointees; (5) the duty to provide necessary and material information to Plan participants; (6) the duty to follow the terms of the Plan; and (7) duty to disclose, protect and pursue appropriate litigation in the name of the Plan against any individuals or entities responsible for causing plan losses.

67.    In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

68.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29, U.S.C. § 1132, Defendants, and each of them, are liable to restore to Plaintiffs the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty. Therefore, Claimants, on behalf of themselves and the Plan, request all equitable, compensatory and/or remedial relief, including prospective injunctive and declaratory relief, as well as credit, disgorgement and restitution, and attorneys' fees, costs and other recoverable expenses of litigation, and requests that the Court enjoin Defendants from further breaches of their fiduciary duties.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against All Defendants)

69.    The allegations of paragraphs 1 through 68 are incorporated herein by reference.

70.     The Defendants are fiduciaries of the Plan under ERISA, as explained above, and are fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its assets

71.     The Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B) and (C) in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan, with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims

72.     As set forth above, the DST Defendants breached the duty to appoint, monitor and remove appointees.

73.     In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

74.     Pursuant to ERISA § 502, 29, U.S.C. § 1132, the Defendants, and each of them, are liable for the losses that Plaintiffs have suffered as a direct result of Defendants' breaches of fiduciary duty. Therefore, Plaintiffs requests all equitable, compensatory and/or remedial relief, including prospective injunctive and declaratory relief, as well as credit, disgorgement and

restitution, and attorneys' fees, costs and other recoverable expenses of litigation, and requests that the Court enjoin Defendants from further breaches of their fiduciary duties

### THIRD CLAIM FOR RELIEF
**(Breach of Co-Fiduciary Duty Against All Defendants)**

75.     The allegations of paragraphs 1 through 74 are incorporated herein by reference.

76.     Defendants are each a co-fiduciary of the Plan under section 405(a) of ERISA, 29 U.S.C. § 1105(a).

77.     As alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by, among other things, the duty of prudence.

78.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

79.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

80.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other

fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in the breaches of the other Defendants because, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in and failure to monitor the Fund and, upon information and belief, knowingly participated in the improper management of and failure to monitor that investment by the other Defendants.

81.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

82.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiffs, lost millions of dollars of retirement savings.

83.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore Plaintiffs' losses to their Plan accounts caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## FOURTH CLAIM FOR RELIEF
### (In The Alternative, Liability for Knowing Breach of Trust Against All Defendants)

84.     The allegations of paragraphs 1 through 83 are incorporated herein by reference.

85.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

86.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed (and possess) the requisite

knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in the breaches of fiduciary duty  as aforesaid.

87.     To the extent they are consistent with the allegations in this Count, Plaintiffs incorporates all other allegations of this Complaint as though more fully set forth herein.

### FIFTH CLAIM FOR RELIEF
### (In The Alternative, Liability for Benefits Pursuant to ERISA §502(a)(1)(B) Against All Defendants)

88.     The allegations of paragraphs 1 through 87 are incorporated herein by reference.

89.     Pursuant to ERISA §502(a)(1)(B), to the extent that the Plan recovers for any losses resulting from each or any breach of fiduciary duty, as aforesaid, and/or to the extent the Plan is restored of profits made through Defendants' use of Plan assets, and/or to the extent the Plan recovers fees or compensation received by any of the Defendants in connection with any prohibited conduct, as aforesaid, Plaintiffs seeks on behalf of themselves and for their individual account losses seek a proportional share of the benefits and/or recovery due under the terms of the Plan.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and for their individual account losses, demand judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Claimant and/or the Plan may be justly

entitled, and the Court deems appropriate and just under all of the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs request trial by jury of any issue so triable.

DATED: September 28, 2018

KENT, BEATTY & GORDON, LLP

*/s/ Joshua B. Katz*
Joshua B. Katz
Eleven Times Square
New York, New York 10036
(212) 421-4300
jbk@kbg-law.com

THE KLAMANN LAW FIRM
John M. Klamann
Andrew Schermerhorn
Paul D. Anderson
4435 Main Street, Suite 150
Kansas City, MO 64111
(816) 421-2626
jklamann@klamannlaw.com
ajs@klamannlaw.com
panderson@klamannlaw.com
*Pro Hac Vice Applications to be Submitted*

KAPKE & WILLERTH
Ted Kapke
Mike Fleming
3304 N.E. Ralph Powell Road
Lee's Summit, MO 64064
(816) 461-3800
ted@kapkewillerth.com
mike@kapkewillerth.com
*Pro Hac Vice Applications to be Submitted*

WHITE, GRAHAM, BUCKLEY & CARR
William Carr

Bryan T. White
19049 East Valley View Parkway
Independence, MO 64055
(816) 373-9080
wcarr@wagblaw.com
bwhite@wagblaw.com
*Pro Hac Vice Applications to be Submitted*


HUMPHREY, FARRINGTON & McCLAIN
Kenneth B. McClain
221 West Lexington, Suite 400,
P.O. Box 900
Independence, MO 64051
Telephone: (816) 836-5050
kbm@hfmlegal.com
*Pro Hac Vice Applications to be Submitted*

*Attorneys for Plaintiffs*